1  ANDREW L. PACKARD (State Bar No. 168690)
   WILLIAM N. CARLON (State Bar No. 305739)
2  Law Offices of Andrew L. Packard
   245 Kentucky Street, Suite B3
3  Petaluma, CA 94952
   Tel:  (707) 782-4060
4  Fax: (707) 782-4062
   E-mail: andrew@packardlawoffices.com
5          wncarlon@packardlawoffices.com
6  Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
7  PROTECTION ALLIANCE
8
                  **UNITED STATES DISTRICT COURT**
9
                  **EASTERN DISTRICT OF CALIFORNIA**
10

11  CALIFORNIA SPORTFISHING
    PROTECTION ALLIANCE, a non-profit      Case No. 2:18-cv-01717-JAM-KJN
12  corporation,

13                      Plaintiff,

14          vs.                             **CONSENT JUDGMENT**

15  MINERAL RESOURCES, LLC, MRLLC           **(Federal Water Pollution Control Act,**
    INVESTORS, L.P. AND CHRIS VAN           **33 U.S.C. §§ 1251 to 1387)**
16  VELDHUIZEN,

17                      Defendants.

18

19       **WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") is a

20  nonprofit public benefit corporation dedicated to the preservation, protection, and defense of the

21  environment, wildlife, and natural resources of California's waters;

22       **WHEREAS**, Defendants Mineral Resources, LLC and MRLLC Investors, L.P. (hereinafter

23  "Mineral Resources" or "Defendants") own and/or operate an approximately 240-acre facility at 1324

24  Cherokee Road, in Oroville, California where Defendants conduct various industrial activities

25  including stripping overlying overburden materials; extracting raw silica sand and aggregate using

26  heavy construction equipment; separating, processing and refining these materials through grading,

27  separation and washing processes; stockpiling finished materials; and transportation of finished

28  materials (collectively, the "Facility");

---
CONSENT JUDGMENT                                     Case No. 2:18-cv-01717-JAM-KJN

**WHEREAS**, CSPA and Defendants collectively shall be referred to as the "Parties;"

**WHEREAS**, the Facility collects and discharges storm water from the Facility into storm water conveyances that discharge to Morris Ravine Creek, which drains to the Thermalito Diversion Pool, which is a tributary of the Feather River, which is a tributary of the Sacramento River, the Sacramento-San Joaquin Delta and the San Francisco Bay (a map of the Facility as configured at the time of the execution of this Agreement is attached hereto as **Exhibit A** and incorporated herein by reference);

**WHEREAS**, Morris Ravine Creek, the Thermalito Diversion Pool, the Feather River, the Sacramento River, the Sacramento-San Joaquin Delta and the San Francisco Bay are waters of the United States within the meaning of the Clean Water Act;

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 14-57-DWQ, issued pursuant to Section 402(p) of the Clean Water Act ("Act"), 33 U.S.C. § 1342(p), (hereinafter "General Permit") and, prior to July 1, 2015, were regulated by Water Quality Order No. 91-13-DWQ, as amended by Water Quality Orders 92-12-DWQ and 97-03-DWQ;

**WHEREAS**, on or about April 13, 2018, Plaintiff provided written notice of Defendants' alleged violations of the Act ("Notice Letter"), and of its intention to file suit against Defendants to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the U.S. Attorney General; the Executive Director of the State Board; the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CSPA's Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

**WHEREAS**, Defendants deny the occurrence of the violations alleged in the Notice Letter and maintain that Mineral Resources has complied at all times with the provisions of the General Permit and the Clean Water Act or, alternatively, that there are no "ongoing and continuous" violations of the General Permit or the Act;

**WHEREAS**, on or about June 13, 2018, CSPA filed a complaint against Defendants in the

United States District Court, Eastern District of California (this matter is hereinafter referred to as "the Action");

WHEREAS, the Parties agree that it is in their mutual interest to resolve this matter as to all entities and persons named in the Notice Letter and the Action without further litigation and enter into this Consent Judgment ("Agreement");

WHEREAS, for purposes of this Agreement only, the Parties stipulate that venue is proper in this Court, and that Defendants do not contest the exercise of jurisdiction by this Court to dismiss this matter with prejudice under the terms of this Agreement;

WHEREAS, within five (5) calendar days of mutual execution, this Agreement shall be submitted to the United States Department of Justice ("USDOJ") and the United States Environmental Protection Agency ("USEPA") for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c);

WHEREAS, at the time the Agreement is submitted for review to the USDOJ and the USEPA, CSPA shall submit a Notice of Settlement in the District Court and inform the Court of the expected dismissal date following the expiration of the statutory review period identified above;

AND WHEREAS, within ten (10) calendar days of expiration of the statutory review period, or the earlier receipt of non-objection from the United States Department of Justice, the Parties shall file with the Court this Agreement, and a Stipulation and Order that shall provide that Chris Van Veldhuizen shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) concurrently with the District Court's retention of jurisdiction for the enforcement of this Agreement as provided herein (the date of entry of this Agreement shall be referred to herein as the "Entry Date").

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES AS FOLLOWS:**

## I.  COMMITMENTS OF DEFENDANTS

1.    **Compliance with General Permit and the Clean Water Act.**  Throughout the term of this Agreement, Mineral Resources shall implement all measures needed to operate the Facility in compliance with the requirements of the General Permit and the Clean Water Act.

2.     **Compliance with Waste Discharge Requirement Order No. R5-2003-0096.**

Throughout the term of this Agreement, Defendants shall implement all measures needed to operate the Facility in compliance with Waste Discharge Order ("WDR") No. R5-2003-0096, a copy of which is attached hereto as **Exhibit C.**

3.     **Implementation of Specific Storm Water Best Management Practices.** Unless otherwise indicated below, on or before **December 1, 2019**, Mineral Resources shall complete the implementation and incorporation into the Facility's Storm Water Pollution Prevention Plan ("SWPPP") of the following storm water source control measures/Best Management Practices ("BMPs") at the Facility:

(a)     *Storm Water Pollution Prevention Plan.* On or before June 30, 2019, Defendants agree to revise, certify and upload to SMARTS the Facility's SWPPP to comply with all the requirements in Section X of the General Permit. Defendants shall ensure that the revised SWPPP includes all new BMPs agreed to herein.

(b)     *Facility Mapping.* On or before June 30, 2019, Defendants agree to revise the Facility's Site Map to comply with all of the requirements in Section X.E.1-3 of the General Permit. Mineral Resources shall ensure that the revised Site Map includes all areas of the Facility that are subject to industrial activities.

(c)     *Improvements to C-Pond and Beaver Pond.* On or before June 30, 2019, Defendants shall expand the C-Pond and Beaver Pond (as identified on the Facility's Site Map attached as **Exhibit A**) to meet the design storm standards described in Section X.H.6 of the General Permit. Defendants shall include in their SWPPP hydrologic calculations of the volume of storm water to be treated by C-Pond and Beaver Pond certified by a California licensed professional engineer in accordance with the Professional Engineers Act (Bus. & Prof. Code § 6700, et seq.), as required by Section X.H.6.a of the General Permit. Defendants shall also include in their SWPPP engineering drawings indicating the dimensions of the C-Pond, including the design for the controlled drainage inflow and outflow points. The outflow of C-Pond shall be designed and constructed to permit safe sampling. These hydraulic calculations and engineering drawings shall be produced to Plaintiff on or before June 30, 2019.

(d)     *Improve Road to C-Pond.* Defendants shall improve the road to C-Pond such that the

sampling point at C-Pond is safely accessible at all times of the year, and especially during rain events. Defendants shall stabilize the slopes around the road to the C-Pond to promote access via this road in wet weather.

(e)     *Prevent All Unauthorized Non-Storm Water Discharges.*  Defendants shall prevent all Unauthorized Non-Storm Water discharges from the Facility in accordance with Section III.B of the General Permit.  Defendants shall install any advanced BMPs necessary, including, but not limited to an impermeable berm or curb around each Processing Plant to prevent the discharge of process waters, or storm water that has comingled with process water, from discharging from the Facility.  Defendants shall prevent all discharges of process waters into the Process Pond (as identified on the Facility's Site Map attached hereto as **Exhibit A**) and the C-Pond.  Any water retained in the Processing Plant areas that is not used in the Facility's processing shall be pumped to the Upper Processing Ponds for storage without discharging.

(f)     *Install Drainage Ditches Along Southern Slope.*  Defendants shall install drainage ditches, based on the schematics attached hereto as **Exhibit D**, along the south side of the road running east-west in the Spoils and Reclamation Area.  Defendants shall install drainage ditches, based on the schematics attached hereto as **Exhibit D**, along the Southern Slope such that the ditches will direct all storm water flows on the Southern Slope to the C-Pond.  Defendants shall install check dams, based on the schematics attached hereto as **Exhibit D**, in each drainage ditch installed pursuant to this section of the Agreement in order to slow the flow of storm water within the ditches.

(g)     *Segregation of Authorized Non-Storm Water Discharges from Storm Water Conveyance Systems.*  Defendants shall direct the non-storm water leaching from the hillside north of the Process Plant away from any areas of industrial activity and prevent that non-storm water from comingling with any storm water associated with industrial activity.

(h)     *Stabilization of the Southern Slope.*  Defendants shall take all measures necessary to prevent erosion and rilling on the Southern Slope, as identified on the Facility's Site Map attached hereto as **Exhibit A**.  Defendants shall expand the existing ditches running along the Southern Slope to accommodate flows from an 85th percentile 24-hour storm.  Defendants shall install ditches as needed to divert all Southern Slope drainages to the C-Pond.  Defendants shall install velocity-

reduction structures based on the design schematics attached hereto as **Exhibit D** within all ditches on the Southern Slope. Defendants shall stabilize the Southern Slope by terracing and hydroseeding to prevent erosion and rilling.

(i)     *Installation of an Impermeable Berm Preventing Discharges Down Southern Slope Below the Office.* Defendants shall remove the existing gravel berm and replace it with a comparable impermeable berm along the top of the Southern Slope as identified in the Facility's Site Map attached hereto as **Exhibit A**.

(j)     *Excavation and Maintenance of the Upper Process Ponds.* Defendants shall excavate the Upper Process Ponds, as identified on the Facility's Site Map attached hereto as **Exhibit A**, to meet the specifications identified in the Facility's WDR. Defendants shall include in their SWPPP all hydrologic calculations, engineering drawings, and assumptions used to determine that the Process Ponds have sufficient capacity to accommodate allowable wastewater flow and design seasonal precipitation, and ancillary inflow and infiltration to prevent inundation or washout using total annual precipitation with a return period of 100 years, distributed monthly in accordance with historical rainfall patterns. Defendants shall maintain these Upper Process Ponds and keep a log of all maintenance activities in the Facility's SWPPP.

(k)     *Direct Drainage from Western Storage Area to C-Pond.* Defendants shall implement any advanced BMPs necessary to direct all drainage from the Western Storage Area, as identified on the Facility's Site Map attached hereto as **Exhibit A**, to the C-Pond.

(l)     *Installation of BMPs in Western Storage Area.* Defendants shall equip all stockpiles in the Western Storage Area with BMPs to minimize mobilization of sediment, including, but not limited to straw wattles placed around the perimeter of the base of each pile.

(m)     *Prevent Discharges of Storm Water to Duck Pond.* Defendants shall install any advanced BMPs necessary to prevent the discharge of storm water from the Facility to the Duck Pond and instead re-direct those flows to the C-Pond.

(n)     *Improved Housekeeping at the Mechanic's Shop.* Defendants shall place all oil, grease, gas, diesel, and waste or recycled fluid-storage containers under cover, and in appropriately-sized secondary containment. Defendants shall equip the Mechanic's Shop with a spill kit. Defendants

- 6 -

shall ensure that all materials and containers are properly identified with signs. Defendants shall remove and dispose of properly all hydrocarbon-contaminated soils in and around the Mechanic's Shop, and update the SWPPP to document the estimated quantity, location, and characteristics of each spill. Defendants shall ensure that the Facility's SWPPP contains established procedures and/or controls to minimize spills and leaks. Defendants shall ensure that any spills or leaks are properly cleaned and documented within 48 hours of the spill.

(o)     *Stabilization of the Upper Processing Plant Terrace.*  Defendants shall stabilize the lower face of the slope by re-grading the slope and hydroseeding the face. Defendants shall install an impermeable berm along the top of this slope to prevent erosion caused by surface flows down the face of the slope from the terrace above.

(p)     *Facility's Exit.*  Defendants shall sweep the paved exit road, and any trackout that occurs, weekly, and shall maintain a log of each sweeping event in the Facility's SWPPP.

(q)     *Maintenance of All BMPS.*  Defendants shall maintain all BMPs at the Facility and log all maintenance activities in a log that will be uploaded to SMARTS every month. If no maintenance activities were conducted during the month, the report shall include a statement to that effect.

(r)     *Increased Employee Training.* Defendants shall send Mineral Resources' SWPPT to an Industrial General Permit, industrial storm water BMP installation, and storm water monitoring training course by October 1, 2019. Defendants shall increase training for Mineral Resources' SWPPT, including holding training meetings for all employees in January and October of each calendar year. Defendants shall incorporate the holding of these twice-annual meetings in its new SWPPP. Training shall focus on tracking what storm events qualify for sampling purposes, undertaking visual monitoring, and logging and properly reporting data in the Facility's SWPPP, Annual Report and the State Board's on-line reporting system ("SMARTS"). Defendants shall log these meetings with the date, materials covered, written agenda, and attendees' signatures for each, and shall retain these logs with the SWPPP. At all times during the term of this Agreement, Defendants shall have at least one member of the SWPPT formally certified as a Qualified Industrial Storm Water Practitioner ("QISP");

(s)     *Rain Data*.  Mineral Resources shall maintain a fully automated rain gauge at the Facility and log all data in the Facility SWPPP.

**4.     SWPPP Amendments.**  On or before June 30, 2019 Defendants shall amend, and upload to SMARTS, the Facility SWPPP to incorporate all of the relevant requirements of this Agreement and the General Permit.  These revisions shall reflect all then-current site conditions and practices and identify potential pollutants and their sources, identify the location of all pervious and impervious areas, drop inlets, subsurface conveyances, BMPs, and storm water flow vectors.  These revisions shall also provide for required data logging; weekly monitoring and maintenance of all Facility collection and discharge points during the Wet Season; and twice-annual storm water management training for Facility employees described above.

**5.     Sampling Frequency.**   For the 2019-2020 and 2020-2021 reporting years ending June 30th (2020 and 2021), Defendants shall collect and analyze samples from three (3) Qualifying Storm Events[1] ("QSEs") within the first half of each reporting year (July 1 to December 31), and three (3) QSEs within the second half of each reporting year (January 1 to June 30).  The storm water sample results shall be compared with the values set forth in **Exhibit E**, attached hereto, and incorporated herein by reference.  If the results of any such samples exceed the parameter values set forth in **Exhibit E**, Defendants shall comply with the "Action Memorandum" requirements set forth below.

**6.     Sampling Parameters.**  All six (6) samples in each reporting year shall be analyzed for each of the constituents listed in **Exhibit E** by a laboratory accredited by the State of California, except for pH, which shall be analyzed in the field using a handheld, properly calibrated pH meter. All samples collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded.  Analytical methods used by the laboratory shall

---

[1] A Qualifying Storm Event (QSE) is defined in the General Permit as a precipitation event that: (a) Produces a discharge for at least one drainage area; and (b) is preceded by 48 hours with no discharge from any drainage area.  *See* General Permit, Section XI(b)(1).

comply with General Permit requirements in regard to both test method and detection limit. See General Permit, Table 2, at 43. Sampling results shall be provided to CSPA within seven (7) days of Defendants' receipt of the laboratory report from each sampling event, pursuant to the Notice provisions below.

7. **Exceedance Response Actions ("ERA"); CSPA's Review Of ERA Reports; Meet-and-Confer.** If the results of sampling discussed herein exceed the applicable NALs set forth in **Exhibit E**, Defendants shall comply with the applicable requirements of the General Permit, including the applicable Exceedance Response Action ("ERA") described in Sections I.M and XII of the General Permit. Any Level 1 ERA Evaluation required under Section XII.C.1 of the General Permit during the term of this Agreement shall be memorialized in a memorandum and shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (October 1 following the applicable reporting year); at Plaintiff's request, the Parties' counsel shall meet and confer in good faith regarding the sufficiency of the evaluation pursuant to the dispute resolution provisions herein. Any Level 1 ERA Report required under Section XII.C.2 of the General Permit during the term of this Agreement shall be shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (January 1); at Plaintiff's request, the Parties' counsel shall meet and confer in good faith regarding the sufficiency of the report pursuant to the dispute resolution provisions herein. Any Level 2 ERA Action Plan required under Section XII.D.1 of the General Permit during the term of this Agreement shall be shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (January 1); at Plaintiff's request, the Parties' counsel shall meet and confer in good faith regarding the sufficiency of the plan pursuant to the dispute resolution provisions herein. Any Level 2 ERA Technical Report required under Section XII.D.2 of the General Permit during the term of this Agreement shall be shared with Plaintiff pursuant to the Notice provisions of this Agreement on or before its due date (January 1); at Plaintiff's request, the Parties shall meet and confer in good faith regarding the sufficiency of the report pursuant to the dispute resolution provisions herein.

8. **Inspections During the Term Of This Agreement.** In addition to any site inspections conducted as part of the settlement process and the meet-and-confer process concerning the documents described above, Defendants shall permit representatives of CSPA to perform up to six

(6) physical inspections of the Facility during the term of this Agreement. These inspections shall be performed by CSPA's counsel and consultants and may include sampling, photographing, and/or videotaping; CSPA shall provide Defendants with copies of all sampling reports, photographs and/or video. CSPA shall provide at least forty-eight (48) hours advance notice of such physical inspection, except that Defendants shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals. In such case, Defendants shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CSPA may proceed. Defendants shall not make any alterations to Facility conditions during the period between receiving CSPA's initial forty-eight (48) hour advance notice and the start of CSPA's inspection that Defendants would not otherwise have made but for receiving notice of CSPA's request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations. Nothing herein shall be construed to prevent Defendants from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

9. **Communications To/From Regional and State Water Boards.** During the term of this Agreement, Mineral Resources shall provide CSPA with copies of all documents submitted to, or received from, the Regional Water Board or the State Water Board concerning storm water discharges from the Facility, including, but not limited to, all documents and reports submitted to the Regional Water Board and/or State Water Board as required by the current General Permit. Such documents and reports shall be provided to CSPA pursuant to the Notice provisions set forth below and contemporaneously with Mineral Resources' submission(s) to, or, receipt from, such agencies.

10. **SWPPP Amendments.** Pursuant to the Notice provisions set forth below, Defendants shall provide CSPA with a complete copy of the updated version of the Facility SWPPP within fourteen (14) days of any amendments to the Facility SWPPP made during the term of the Agreement.

**II. MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS**

11. **Mitigation Payment In Lieu Of Civil Penalties Under the Clean Water Act.** As mitigation to address any potential harms from the Clean Water Act violations alleged in the Action,

- 10 -

Defendants agree to pay the total sum of $75,000 to the Rose Foundation for Communities and the Environment ("Rose Foundation") for projects to improve water quality in Morris Ravine Creek, the Thermalito Diversion Pool, the Feather River, the Sacramento River, the Sacramento-San Joaquin Delta and/or the San Francisco Bay.

> **12.** **Compliance Monitoring Funding.** To defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring Defendants' compliance with this Agreement, Defendants agree to contribute $12,500 for each of the two Wet Seasons covered by this Agreement ($25,000 total for the term of the Agreement), to a compliance monitoring fund maintained by counsel for CSPA. Compliance monitoring activities may include, but shall not be limited to, site inspections, review of water quality sampling reports, evaluations, technical reports, action plans and annual reports, as well as discussions with Defendants concerning the ERA reports and action plans referenced above.

> **13.** **Reimbursement of Fees & Costs.** Defendants agree to reimburse CSPA in the amount of $75,000 to defray CSPA's reasonable investigative, expert, consultant, and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the action, and negotiating a resolution of the Action in the public interest.

> **14.** **Installment Payments; Payee; Liquidation on Default.** Mineral Resources, LLC and MRLLC Investors, L.P. are jointly and severally liable for the payment of the obligations set forth in Paragraphs 11-13 above (totaling $175,000). The payments shall be remitted in 24 installments, by the dates set forth below. All payments shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account" and remitted to Plaintiff's counsel at the address set forth in the Notice provisions in paragraph 27 below.

| Remittance Due | Amount | Remittance Due | Amount |
|---|---|---|---|
| June 1, 2019 | $16,875 | June 1, 2020 | $6,875 |
| July 1, 2019 | $6,875 | July 1, 2020 | $6,875 |
| August 1, 2019 | $6,875 | August 1, 2020 | $6,875 |
| September 1, 2019 | $6,875 | September 1, 2020 | $6,875 |
| October 1, 2019 | $6,875 | October 1, 2019 | $6,875 |

| | | | | |
|---|---|---|---|---|
| November 1, 2019 | $6,875 | | November 1, 2020 | $6,875 |
| December 1, 2019 | $6,875 | | December 1, 2020 | $6,875 |
| January 1, 2020 | $6,875 | | January 1, 2021 | $6,875 |
| February 1, 2020 | $6,875 | | February 1, 2021 | $6,875 |
| March 1, 2020 | $6,875 | | March 1, 2021 | $6,875 |
| April 1, 2020 | $6,875 | | April 1, 2021 | $6,875 |
| May 1, 2020 | $6,875 | | May 1, 2021 | $6,875 |

In the event that any payment owed by Defendants under this Agreement is not remitted to the Law Offices of Andrew L. Packard on or before the Remittance Due date set forth above, Defendants shall be deemed to be in default of their obligations under this Agreement. CSPA shall provide email notice to Defendants of any default. If Defendants fail to remedy the default by the 10th day of the month in which the remittance was due, or within five business days of CSPA's notice, whichever is later, then all unpaid payments due under this Agreement shall become immediately due and payable, and interest owed to CSPA will begin accruing immediately at the rate of ten percent per annum. Payment to the Rose Foundation for Communities and the Environment will be made by the Law Offices of Andrew L. Packard from the above payments.

     **15.**     **Lien.** To secure the obligations identified in paragraph 11-14 above, and only those paragraphs, Defendants agree that CSPA shall be entitled to place a lien in the amount of $175,000, plus interest as calculated in paragraph 14 above, on the property on which the Facility is located, Assessor's Parcel Number 041-300-003-000 (the "Property"), upon the entry of this consent judgment.

     **16.**     **No Additional Encumbrances During 45-Day Review Period.** Defendants agree not to further encumber the Property during the 45-day USDOJ and EPA review period. If, for any reason, the Property becomes further encumbered during this time CSPA may elect to render this Agreement null and void by providing notice to Defendants, pursuant to the notice provision below, within a week of the end of the 45-day review period.

**III.**    **DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE**

     **17.**     If a dispute under this Agreement arises, or either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer within seven (7) days of receiving written

notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, either Party may request a conference with Magistrate Judge Kendall J. Newman for the purpose of assisting in resolving any dispute. The parties hereby consent to proceed before Judge Newman for all purposes and agree to execute any documents required to formalize such jurisdiction. Only after a conference with Judge Newman fails to resolve the parties' dispute shall any party be entitled to all rights and remedies under the law to enforce this Agreement, including filing a motion with the District Court of California, Eastern District, which shall retain jurisdiction over the Action until the Termination Date for the limited purposes of enforcement of the terms of this Agreement. The Parties shall be entitled to seek attorneys' fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in the then-applicable federal Clean Water Act and Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provision.

**18.    CSPA's Waiver and Release.** Upon the Entry Date of this Agreement, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and its officers, directors, employees, shareholders, parents, subsidiaries, and affiliates (including Chris Van Veldhuizen), and each of its predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims which arise from or pertain to the Action, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in this Action, for the alleged failure of Defendants to comply with the Clean Water Act at the Facility, up to the Entry Date.

**19.    Defendants' Waiver and Release.** Defendants, on their own behalf and on behalf of any Released Defendant Party under its control, release CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the

Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

## IV. **MISCELLANEOUS PROVISIONS**

20. The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation. Nothing in this Agreement shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

21. The Agreement shall be effective upon mutual execution by all Parties. The Agreement shall terminate on the "Termination Date," which shall be September 30, 2021.

22. The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Agreement shall be valid as an original.

23. In the event that any one of the provisions of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

24. The language in all parts of this Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Agreement shall be construed pursuant to the law of the United Sates, without regard to choice of law principles.

25. The undersigned are authorized to execute this Agreement on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Agreement.

26. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Agreement are contained herein. This Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Agreement, unless otherwise expressly provided for therein.

27. **Notices.** Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to CSPA pursuant to this Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> William Jennings, Executive Director
> California Sportfishing Protection Alliance
> 3536 Rainer Avenue
> Stockton, California 95204
> Tel: (209) 464-5067
> E-mail: deltakeep@me.com
>
> With copies sent to:
>
> Andrew L. Packard
> William N. Carlon
> Law Offices of Andrew L. Packard
> 245 Kentucky Street, Suite B3
> Petaluma, California 94952
> Tel: (707) 782-4060
> E-mail: andrew@packardlawoffices.com
>        wncarlon@packardlawoffices.com

Any notices or documents required or provided for by this Agreement or related thereto that are to be provided to Defendants pursuant to this Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

> Chris Van Veldhuizen
> Mineral Resources, LLC
> 650 Georgia Pacific Way
> Oroville, CA 95965
> E-mail: chrisv@sierrasilica.com

With copies sent to:

> Thomas M. Swett
> BURTON RICHARDS & SWETT, P.C.
> 47 Main Street
> Sutter Creek, CA 95685
> E-mail: tswett@brs-law.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

28. Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

29. If for any reason the Court should object to this Agreement in the form presented, the

Parties shall use their best efforts to work together to modify the Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Agreement in a mutually acceptable manner, this Agreement shall become null and void.

30.     This Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any party on the ground that any such party drafted it.

31.     This Agreement and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Agreement.

32.     This Agreement may be amended or modified only by a writing signed by the Parties or their authorized representatives.

The Parties hereto enter into this Agreement and respectfully submit it to the Court for entry upon the expiration of the statutory review period.

IT IS HEREBY SO STIPULATED:

Dated:  April _____, 2019          California Sportfishing Protection Alliance

                                        By:     _____
                                                William Jennings, Executive Director

Dated:  April _____, 2019          Mineral Resources, LLC

                                        By:     _____
                                                Chris Van Veldhuizen, Authorized Agent

Dated:  April _____, 2019          MRLLC Investors, L.P.

                                        By:     _____
                                                Charley Pettigrew, Authorized Agent

IT IS SO ORDERED:

Dated: July 3, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

cspa.1717

**EXHIBIT A – Facility Site Map**

**(see docket)**

**EXHIBIT B – CWA Notice of Violation and Intent to Sue Letter**

**(see docket)**

**EXHIBIT C – Waste Discharge Order No. R5-2003-0096**

**(see docket)**

**EXHIBIT D – BMP Design Schematics**

*Note: This exhibit has been left blank and is expected to be completed on or before June 30, 2019, when it will be added to the final agreement filed with the Court.*

**EXHIBIT E**

| Parameter | Value |
|---|---|
| pH (Field test) | 6.0 – 9.0 s.u.[2] |
| Total Suspended Solids | 100 mg/L[3] |
| Oil & Grease | 15 mg/L |
| Nitrate plus Nitrite Nitrogen | 0.68 mg/L |
| Mercury | 0.00005 mg/L |

---

[2] s.u. = standard units.

[3] mg/L = milligrams per liter.